UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| CITY OF HICHCOCK,<br>    *Plaintiff,* | § <br> § <br> § <br> § | |
| v. | § <br> § | CIVIL ACTION NO. |
| | § <br> § | |
| GALVESTON COUNTY, TEXAS and<br>JIMMY FULLEN, in his official capacity<br>as Sheriff of Galveston County,<br>    *Defendants.* | § <br> § <br> § <br> § <br> § | |

## PLAINTIFFS' ORIGINAL VERIFIED COMPLAINT FOR DECLARATORY JUDGEMENT AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, City of Hitchcock ("the City"), files this Original Verified Complaint against Defendants Galveston County and Jimmy Fullen, in his official capacity as Sheriff of Galveston County, and would show the Court as follows:

## I. PRELIMINARY STATEMENT

1.    The City brings this emergency action to remedy the unlawful, unconstitutional seizure of its public municipal bank account by Defendants Galveston County and Sheriff Jimmy Fullen. On June 23, 2026, Defendants executed a search and seizure warrant confiscating $721,408.11 from the City's general fund bank account at Prosperity Bank. This represents approximately 9% of the City's total annual operating budget, directly crippling municipal functions, public safety, and infrastructure services. To date, Defendants have yet to file a notice of seizure and forfeiture or hold a hearing regarding the funds seized.

2.　This action is brought pursuant to 42 U.S.C. § 1983 to defend the City's rights under the Fourth and Fourteenth Amendments to the United States Constitution. The City further requests an immediate Temporary Restraining Order (TRO) to prevent irreparable harm to its citizens.

## II. PARTIES

3.　Plaintiff City of Hitchcock is a home-rule municipality duly organized under the laws of the State of Texas, located entirely within Galveston County.

4.　Defendant Galveston County is a political subdivision of the State of Texas.

5.　Defendant Jimmy Fullen is the duly elected Sheriff of Galveston County. At all relevant times, he acted under color of state law and as a final policymaker for the County regarding law enforcement seizures.

## III. JURISDICTION AND VENUE

6.　This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 and the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

7.　Jurisdiction is conferred upon this Court by 28 U.S.C. § 1343(a)(3), (4) relating to actions arising under 42 U.S.C. § 1983 and by 28 U.S.C. § 1331 (federal question).

8.　Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all parties reside in the Southern District of Texas and all the events giving rise to the claim occurred here.

## IV. FACTS

9.      The City of Hitchcock maintains a general fund bank account utilized to pay for essential services, including street repairs, drainage infrastructure, police protection, emergency response, fire services, animal control, maintenance of city vehicles, solid waste disposal, technology infrastructure, liability insurance, and municipal payroll.

10.      In 2010, the City passed an ordinance pertaining to game rooms and video gaming devices ("Amusement Ordinance"). Pursuant to the Amusement Ordinance, the City charges licensing fees on video gaming devices and establishments containing more than five video gaming devices. Additionally, the Amusement Ordinance requires a background check by the City's Police Department for all employees of establishments containing more than five video gaming devices. A true and correct copy of the current Amusement Ordinance is attached as *Exhibit A.*

11. The fees due pursuant to the Amusement Ordinance are due in October every year. Most recently, in 2025, the City collected approximately $842,320 in fees pursuant to the Amusement Ordinance.

12.      On February 18, 2026, the Galveston County Sheriff executed a search warrant at City Hall. The Sheriff seized all records related to the City's Amusement Ordinance. Employees of the business listed as having a license in the City's records were arrested and charged with gambling-related offenses.

13.      Then on June 23, 2026, without prior notice, a pre-deprivation hearing, or a clear nexus showing that money in City's general fund constituted criminal proceeds, Defendants seized $721,408.11 from the City's general fund account. A true and correct

copy of the search and seizure warrant and affidavit for search and seizure warrants is attached as *Exhibit B*.

14.     The seized operating account is the City's primary operating account through which substantially all day-to-day governmental expenditures are made, including payroll, vendor payments, contractual obligations, and funding for essential governmental services. These funds are not discretionary reserves but are actively used to support the City's daily operations. The funds seized represents approximately 9% of the City's annual General Funds revenues.  *See* the Affidavit of City Assistant Manager and Finance Director Monio Mark II attached as *Exhibit C* at ¶¶6 and 7.

15.     The funds seized by Defendants were not from the Amusement Ordinance permitting and licensing fees collected nine months prior in October 2025.  The funds collected in 2025 had long been spent by the City on essential services.  Instead, the funds Defendants seized were commingled municipal revenues, including property tax revenues, sales tax revenues, grant proceeds, bond proceeds, utility revenues, and other lawful governmental revenues used to finance the City's daily operations. *See Exhibit C* at ¶11.

16.     The funds seized by Defendants were budgeted and being used to fund essential governmental services, including police protection, emergency response, fire services, street maintenance, drainage infrastructure, water and wastewater operations, animal control, maintenance of City vehicles, solid waste disposal, technology infrastructure, liability insurance, municipal payroll, and other lawful governmental purposes. *See Exhibit C* at ¶12.

17.    As a direct result of the seizure, checks issued by the City before the seizure were returned for insufficient funds, and other payments had to be delayed or voided because sufficient funds were unavailable. *See Exhibit C* at ¶8.

18.    City employees expressed concern regarding the City's ability to timely process payroll and continue normal governmental operations. Residents also contacted City officials expressing concern regarding whether essential municipal services would continue without interruption. *See Exhibit C* at ¶8.

19.    The City has no immediately available line of credit or other rapid financing mechanism capable of replacing the seized operating funds. Accordingly, the City was required to immediately implement emergency financial measures, including establishing new banking arrangements and modifying its normal cash management procedures to continue governmental operations. City staff have devoted substantial time coordinating with banking institutions, legal counsel, the City's financial advisor, vendors, employees, and other governmental entities in response to this financial emergency, diverting staff from their normal responsibilities of serving the City's residents. *See Exhibit C* at ¶9.

20.    The seizure of the City's operating funds could adversely affect the City's planned September 2026 Certificate of Obligation issuance. The City likely will have to issue the Certificates of Obligation at a higher interest rate than would otherwise have been available. The planned Certificate of Obligation is intended to finance public infrastructure improvements necessary to support a significant residential development within the City. Increased borrowing costs would increase the overall cost of those public improvements

and will reduce financial resources available for other municipal priorities and services. *See Exhibit C* at ¶14.

21. The seizure of the City's General Fund has created concerns regarding the City's financial stability. As a result of those concerns, progress on the development has been delayed. The development is expected to expand the City's tax base, increase utility revenues, generate additional economic activity, and provide new revenues that support essential municipal services for the benefit of the City's current residents. Delays to the development postpone those public benefits and may increase the financial burden on the City's existing taxpayers by delaying new sources of revenue needed to support public safety, infrastructure improvements, drainage, streets, utilities, parks, and other governmental services. Additionally, the uncertainty created by this event has the potential to discourage future private investment and economic development opportunities along one of the City's major commercial thoroughfares. *See Exhibit C* at ¶16.

22. The loss of these public taxpayer funds has caused an immediate, severe emergency, threatening the City's ability to pay for essential services and maintain public safety.

## V. CAUSES OF ACTION

### Count I: 42 U.S.C. § 1983 – Declaratory Judgment

**Sovereign Immunity Bars the County from Seizing Public Municipal Funds Held for Governmental Functions**

23. Each paragraph of this Complaint is incorporated as if fully restated herein.

24.     Defendants' actions constitute an unprecedented constitutional overreach: a county law enforcement agency seizing the general operating funds of a municipal government. The seizure is barred by two insurmountable statutory doctrines: Sovereign Immunity over public funds held for governmental functions, and the explicit statutory protections of Texas Local Government Code § 51.075 and § 51.076. Because Defendants lack the legal authority to execute on municipal public property, the seizure violates the Fourth and Fourteenth Amendments and warrants immediate injunctive relief.

25.     The funds were seized from a governmental function. Under Texas law, a municipality possesses sovereign immunity when performing "governmental functions"— activities enjoined upon a city by law to be given for the benefit of the general public. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011); TEX. CIV. PRAC. & REM. CODE § 101.0215(a) (defining drainage infrastructure, police protection, emergency response, fire services, animal control, maintenance of city vehicles, and solid waste disposal as core governmental functions). The City's general fund consists of public tax revenues, other regulatory fees, and State grants explicitly designated to finance these protected governmental operations.

26.     The Texas Supreme Court has repeatedly held that statutory waivers of immunity must be explicit. Nowhere in Chapter 59 did the Texas Legislature state that a county may bring a civil forfeiture action against property owned and held by a co-equal political subdivision. Because there is no clear and unambiguous waiver of immunity allowing the forfeiture of municipal property, the City's public funds remain cloaked in immunity and are legally insulated from law enforcement seizure.

27.    Texas Local Government Code § 51.076 explicitly insulates municipal public property from seizure and forced attachment. Even if Chapter 59 could be read to apply broadly to public property, the Texas Legislature has enacted an independent, absolute statutory shield protecting home-rule municipal assets from involuntary judicial or extrajudicial seizures.

a.  Statutory Shield Against Execution: Texas Local Government Code §51.076, governing home-rule municipalities, provides: "The municipality may provide that any property owned or held by the municipality is not subject to any kind of execution."

b.  The General Fund is Held for an Absolute Public Purpose: It is a foundational principle of Texas law that public funds raised by taxation or regulatory licensing for the operation of city government are held in trust for the public. To allow another political subdivision to seize these funds subverts the constitutional purpose of municipal governance.

c.  Defendants' Seizure Constitutes an Unlawful "Execution": By seizing and taking physical control of the City's general fund, Defendants have performed an extrajudicial execution. Section 51.076 explicitly deprives any entity—including county law enforcement—of the power to force a sale or execute a judgment against public-purpose municipal property. The County cannot utilize Chapter 59 as a backdoor to bypass the absolute statutory prohibition against executing upon municipal property.

28.    Defendants cannot lawfully take taxpayer funds meant for the benefit and protection of a municipality's citizens. Accordingly, the City is entitled a declaratory judgment that the seizure was unconstitutional and prohibited by United States and Texas law.

## Count II: 42 U.S.C. § 1983 – Fourth Amendment – Unreasonable Seizure

29.     The City incorporates all prior paragraphs by reference.

30.     The Fourth Amendment protects against unreasonable searches and seizures. The City, acting in its corporate capacity to protect its proprietary public funds, is protected from arbitrary law enforcement seizures.

31.     Defendants lacked probable cause to believe that the $721,408.11 in the City's General Fund was connected to criminal activity. The sweeping seizure of public funds was grossly overbroad and legally unsupportable in violation of the Fourth Amendment.

## Count III: 42 U.S.C. § 1983 – Fourteenth Amendment – Violation of Procedural Due Process

32.     Each paragraph of this Complaint is incorporated as if fully restated herein.

33.     The Fourteenth Amendment prohibits the deprivation of property without due process of law, procedural and substantive.

34.     The City has the duty and right to protect public funds held in trust.

35.     Defendants seized the City's operating capital without providing prior notice, an adversarial hearing, or an immediate, expedited post-seizure judicial review, completely disrupting the governance of a political entity.

## VI.  APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

36.     Each paragraph above is incorporated as if fully restated herein.

37.   The City seeks a temporary restraining order and a preliminary injunction pursuant to Federal Rule of Civil Procedure Rule 65.  In particular, the City seeks the return of $721,408.11 seized from the City's general fund bank account by Defendants.

38.   The requirements for showing entitlement to a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65 are identical. *See Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). To obtain a temporary restraining order and a preliminary injunction, the City must show that:

> A. there is a substantial likelihood of success on the merits;
>
> B. there is a substantial threat that irreparable injury will result if the injunction is not granted;
>
> C. the threatened injury outweighs any harm to the defendants from the injunction and order; and
>
> D. granting the preliminary injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

39.   The requisite showing for a stay pending review is the same as that which applies to preliminary injunctions. *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015) (citing *Corning Sav. & Loan Assoc. v. Federal Home Loan Bank Bd.*, 562 F. Supp. 279, 280 (E.D. Ark. 1983)).

40.   <u>Substantial Likelihood of Success on the Merits</u>: The City is highly likely to succeed because law enforcement cannot legally seize a municipality's entire general operating fund as argued above. The seizure by Defendants was not supported by probable cause and is otherwise against the United States Constitution and Texas Law.

29.     Irreparable Harm: Without an immediate restraining order returning the funds, the City faces catastrophic financial shortfalls, leading to imminent public safety issues. Those funds provide the City's residents with essential services, including street repairs, drainage infrastructure, police protection, emergency response, fire services, animal control, maintenance of city vehicles, solid waste disposal, technology infrastructure, liability insurance, and municipal payroll. *See Exhibit C.*

30.     Threatened injury outweighs any harm to Defendants from the order: There is no harm to Defendants from temporarily restraining and preliminarily enjoining the Defendants to return the City's funds. Alternatively, granting temporary relief requested will avoid a financial crisis for the City.

31.     Balance of Equities & Public Interest: The balance of equities heavily favors the City. The public interest is profoundly disserved if Defendants are allowed to take taxpayer funds and disable a municipality's emergency and public infrastructure services.

32.     Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), in addition to normal service procedures, counsel is emailing a copy of this document and all attachments to Megan Jones and Brent Haynes of the Galveston County District Attorney's Office and Galveston County Sheriff Jimy Fullen. Given the irreparable harm noted above, further notice should not be required.

## VI. PRAYER

Plaintiff City of Hitchcock respectfully requests that this Court:

1. Issue an immediate Temporary Restraining Order commanding Defendants to return the $721,408.11 to the City of Hitchcock;

2. Enter a Preliminary and Permanent Injunction prohibiting Defendants from seizing, holding or spending City of Hitchcock's funds;

3. Issue a Declaratory Judgment stating that the seizure of the City of Hitchcock's general fund violates Sovereign Immunity, Texas Local Government Code, the Fourth Amendment and the Fourteenth Amendment;

4. Award reasonable attorneys' fees under 42 U.S.C. § 1988 and court costs; and

5. Award the City of Hitchcock and such other and further relief that the Court may deem just and equitable.

Respectfully submitted,

/s/ *Sara Richey*
Sara Richey
Texas Bar No. 24068763
11777 Katy Freeway, #335
Houston, TX 77079
Tel: 713-636-9931
sara@thericheylawfirm.com
ATTORNEY-IN-CHARGE